IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: § | § | CASE NO. 10-50713 |
| GULF FLEET HOLDINGS, INC., *et al.* § | § | Jointly Administered |
| Debtors. § | § | (Chapter 11) |

**OBJECTION OF COMERICA BANK, AS ADMINISTRATIVE AND COLLATERAL AGENT FOR SENIOR BANK LENDERS, TO DEBTORS' THIRD MOTION FOR INCREASE OF EXCLUSIVE PERIOD**
[Relates to Docket No. 656]

Comerica Bank, in its capacity as Administrative and Collateral Agent (in such capacity, "Comerica"), for itself and a syndicate of secured lenders (collectively, the "Senior Bank Lenders"), files this Objection to the *Debtors' Third Motion for Increase of Exclusive Period in Which the Plan is to be Accepted in Order to Maintain the Exclusive Period* (the "Motion or Exclusivity Motion").

## SUMMARY OF ARGUMENT

1. On October 21, 2010, the Senior Bank Lenders and Debtors agreed to an extension of the Final Cash Collateral Order on the condition that the Debtors file a plan of reorganization no later than December 13, 2010 (the "Second Plan Deadline"). Having filed putative "bare bones" plans[1] on December 13, 2010, the Debtors believe their authority to use cash collateral is extended to January 28, 2011 and that exclusivity now extends 60 days beyond

---

[1] The Plans are vague, incomplete and ambiguous. There is no certainty with respect to obtaining exit financing or with respect to proposed treatment of Senior Bank Lenders. Although alternative treatment may be acceptable to a point, the proposed "alternative" treatment of Senior Bank Lenders is so vague as to be no treatment at all, thus failing to satisfy the requirements off 11 U.S.C. § 1123(a)(3).

December 13, 2010, *i.e.* to February 11, 2011.[2] By the Exclusivity Motion, the Debtors seek to extend the exclusive period ("Exclusivity") within which the Debtors may solicit acceptances of such plans beyond February 11, 2011, for an additional 60 days or until April 11, 2011. The Senior Bank Lenders object and ask that the requested extension be denied.

## PRELIMINARY STATEMENT

2. At the commencement of these jointly administered cases (the "Case"), Gulf Fleet Holdings Inc., and certain of its affiliates and subsidiaries (each a "Debtor" and collectively, the "Debtors") and Comerica engaged in negotiations concerning a possible consensual plan for the Debtors' re-structure and exit from bankruptcy. Based on concessions resulting from the Motion to Compel Sale[3] and the Debtors' Second Exclusivity Request,[4] the Senior Bank Lenders consented to the Debtors' further use of cash collateral and agreed to the second extension of exclusivity. Since that second extension, the parties' negotiations stalled and vanished resulting in the Debtors filing four plans of reorganization (collectively, the "Plans") and a consolidated disclosure statement (the "Disclosure Statement")[5], neither of which have the support of the Senior Bank Lenders or any other major creditor constituency in this Case. Although this Court has granted two previous Exclusivity extensions thereby allowing the Debtors to enjoy nearly 215 days of Exclusivity, the Debtors have filed a third Exclusivity motion seeking 60 days (in addition to the statutorily provided 60 days) to solicit votes in connection with the Plans. In the Exclusivity Motion, the Debtors fail to offer any valid grounds as to why the 60-day statutory period is an insufficient amount of time for them to solicit votes in connection with the Plans.

---

[2] Senior Bank Lenders reserve and expressly do not waive their belief and argument that the plans filed December 13, 2010 do not qualify as "plans" within the meaning of 11 U.S.C. § 1123 for the reason that they are vague and uncertain with respect to treatment of many classes, including most particularly the Senior Bank Lenders.
[3] *See* Dkt. Nos. 279 and 286.
[4] *See* Dkt. No. 560.
[5] *See* Dkt. No. 665.

Rather, the requested extension appears to allow the Debtors additional time to actually *formulate* a plan as the Debtors have not finalized the substance of their reorganization strategy. Accordingly, this Court should not extend Exclusivity for a third time and the Motion should be denied.

## PROCEDURAL BACKGROUND

3. On May 14, 2010 (the "Petition Date"), the Debtors each filed a petition for relief under Title 11 of Chapter 11 of the United States Code (the "Bankruptcy Code"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue in the management and possession of their businesses and property as debtors-in-possession.

4. On May 24, 2010, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee").

5. No trustee or examiner has been appointed in the Case.

## FACTUAL BACKGROUND

6. The Debtors' assets and business are simple, though their capital structure is fairly complex. The Debtors own and operate 17 vessels[6] that perform various functions for the oil and gas industry.

7. The Senior Bank Lenders are the largest and primary secured lender in this Case and has an interest in cash collateral. The Senior Bank Lenders are owed at least $37.4 million, consisting of $1.5 million on a revolver and $35.9 million on a term loan, all amounts being secured by all assets of the Debtors (other than the Mike Hillman Litigation, the Gulf Sun and

---

[6] The Debtors initially owned 18 vessels; however, one vessel has been sold during the Case.

OBJECTION OF COMERICA BANK TO THIRD EXCLUSIVITY MOTION – PAGE 3
017104 000414 HOUSTON 719116.5

10-50713 - #681  File 12/23/10  Enter 12/23/10 12:25:24  Main Document  Pg 3 of 16

the Gulf Sabre).[7] Each of Gulf Fleet's subsidiaries has guaranteed the obligations owed to the Senior Bank Lenders.

8. In addition to the $37.4 million owed to the Senior Bank Lenders, the Debtors owe an additional $26.5 million to other secured and/or subordinated lenders and approximately $2.5 million to unsecured creditors (ex-intercompany debt). The Gulf Sun is collateral for a $6.1 million term loan owed to LBC Credit Partners, II, L.P.,[8] and the Gulf Sabre is collateral for a $3.9 million loan owed to Bank One Equity Investors-BIDCO, Inc.[9] Additionally, the Debtors owe $7.6 million pursuant to a Term B Note executed in favor of Brightpoint Capital ("Brightpoint") on behalf of the Junior Bank Lenders, who are secured by a second lien on the same collateral as the Senior Bank Lenders. The Debtors are also indebted in the amount of $8.7 million pursuant to a 2010 Convertible Sub Note owed to Gulf Fleet Financing, LLC.[10]

9. Interest on the Senior Bank Lenders' debt is approximately $650,000 per quarter (calculated on the contract and not default rate)[11] and is not being paid post-petition.

10. Roughly 50% of the Debtors' vessels are 25 years of age or older. Six of the vessels are 0-10 years of age, 3 are 11-20 years of age, 3 are 21-30 years of age,[12] and 6 are over 30 years of age. Currently, 4 of the 18 initial vessels (the Gulf Ranger has been sold) are actively chartered (generally the younger vessels) and producing revenue. Nine of the vessels are cold stacked and not capable of being put to immediate use without varying degrees of repair

---

[7] The obligations of the Senior Bank Lenders are not secured by two vessels, the Gulf Sabre and the Gulf Sun. Upon information and belief, the Gulf Sabre is collateral for Bank One Equity Investors-BIDCO, Inc. and the Gulf Sun is collateral for LBC Credit Partners, II, L.P. References to the Senior Bank Lenders' collateral expressly exclude those vessels. The Gulf Sabre is the subject of a pending sale motion [Dkt. No. 676].
[8] The Debtors scheduled the Gulf Sun as having a value of $720,000. *See* Gulf Fleet Offshore, LLC, Case No 10-50716, Dkt. No. 201, Schedule B, Personal Property, para. 26.
[9] The Debtors scheduled the Gulf Sabre as having a value of $1.7 million. *See* Gulf Fleet, LLC, Case No 10-50715, Dkt. No. 197, Schedule B, Personal Property, para. 26.
[10] The Gulf Fleet Financing LLC note is scheduled as an unsecured claim in amount of $8,743,307.25.
[11] The Senior Secured Lenders do not waive their right to assert interest at the default rate as part of their secured claim.
[12] One of these, the Gulf Ranger, has been sold.

and maintenance, and 4 vessels are off charter though apparently seeking work. The Debtors' producing revenue has nosedived. The Debtors' operations have gone from having 13 active and utilized vessels generating revenue of $87,150 per day on September 3, 2010, to currently 4 active vessels generating only $25,250 per day. While the Debtors' business is admittedly somewhat cyclical, the current trends are all negative.

11. At the inception of the Case, the Debtors and Comerica engaged in negotiations concerning the terms of a consensual plan. Through these negotiations, the Debtors and Comerica initially agreed on the terms of the Debtors' use of the Secured Bank Lenders' cash collateral to allow the Debtors to continue to operate their business in the ordinary course. The Debtors' use of the Senior Bank Lenders' cash collateral on a consensual basis was embodied in five interim cash collateral orders.[13] The Senior Bank Lenders did not agree to the Final Cash Collateral Order[14] and it was entered over their objection.

12. On July 26, 2010, the Senior Bank Lenders filed a *Motion to Compel Debtors to Enter into Structured Process for Sale of Business and/or Assets and to Establish Procedures and Schedule in Connection Therewith* as the only reasonable way to ascertain and capture value for the benefit of the Senior Bank Lenders as well as the other constituencies in this Case.

13. On August 12, 2010, the Debtors filed their *Motion for Increase of Exclusive Period in which the Debtors have to File a Plan of Reorganization and to Increase the Exclusive Period in Which the Plan is to be Accepted in Order to Maintain the Exclusive Period* (the "First Exclusivity Motion"). The Court granted the First Exclusivity Motion over the objection of the Senior Bank Lenders, the Committee, and other parties-in-interest.

---

[13] Docket Nos. 68, 119, 172, and 237.
[14] Docket No. 324, signed August 5, 2010.

14. The Senior Bank Lenders and the Debtors continued to negotiate, which resulted in a Joint Motion to approve a settlement (the "Compromise Motion).[15] The Compromise Motion sought approval of a Letter Agreement dated August 27, 2010, and certain other email communications. By Order entered on September 20, 2010,[16] this Court approved the Compromise Motion, which directed the Debtors to market and sell seven of its non-core vessels and extended the Debtors' exclusive period to file a plan until October 29, 2010 (the "Initial Plan Deadline").

15. Shortly before the Initial Plan Deadline, on October 15, 2010, the Debtors filed their Second Exclusivity Motion, seeking an extension to file a plan until December 29, 2010 and to solicit acceptances of such plan until February 28, 2011.

16. Once again the Senior Bank Lenders negotiated with the Debtors and agreed to an extension of the Final Cash Collateral Order on the condition that the Debtors file a plan of reorganization no later than December 13, 2010 (the "Second Plan Deadline"). Assuming the Debtors' "bare bones" Plans filed on December 13, 2010 meet this requirement (which the Senior Bank Lenders expressly do not concede), the Debtors' authority to use cash collateral would expire on January 28, 2011.

17. The Disclosure Statement describes the following treatment of the Senior Bank Lenders:

> The Plans provide alternative treatment of the Comerica Secured Claim. The <u>first alternative</u> provides for (i) Cash in the <u>approximate</u> amount of $4,000,000 <u>or such amount as may be determined</u> by the Bankruptcy Court to be [cash collateral] . . .; (ii) payment from the proceeds of the <u>potential Exit Loan Facility</u> of <u>approximately</u> $20,000,000.00 or <u>such other amount</u> as is agreed or determined by

---

[15] *See Joint Motion of Debtors and Comerica Bank, as Administrative and Collateral Agent for Senior Bank Lenders, for Approval of a Settlement and Compromise Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bank. P. 9019(a),* Dkt. No. 458.
[16] *See Order Approving Settlement and Compromise* [ Dkt. No. 519].

the Bankruptcy Court to be the value of the Active Vessels[17]; (iii) the return and transfer of the Retired Vessels[18] . . . for a credit . . . <u>to the extent of the value</u> . . . <u>to be determined</u> by agreement . . . or by the Bankruptcy Court; and (iv) any remaining . . . portion of . . . Claim will be . . . General Unsecured Claim. The second alternative, . . . <u>at the option of the Debtors</u>, the exercise of <u>any one or a combination</u> of each of the elements of the first alternative, with . . . a new promissory note . . . over seven (7) years with a ten (10) year amortization and interest at five percent (5%) per annum.[19]

18. The range of possible treatment of Senior Bank Lenders, under the first alternative, is (a) receipt of $4 million cash, *or possibly less*, for its cash collateral; (b) payment *of some or all or none or more*[20] of $20 million of exit financing that *may, or may not*, be available, *depending on the value of 1 or 10 or some* of the Active Vessels, depending on the *Debtors' discretion*; (c) the return of *one or more* of the 5 unsold, retired vessels[21] for credit in an *uncertain amount*; and (d) the treatment of any deficiency as an unsecured claim. Under the second alternative, the treatment of the Senior Bank Lenders is, at the option of Debtors, any one or a combination of the first alternative, but the deficiency claim, if any, is to be satisfied through a 7 year note[22] at 5% interest. In sum, the Senior Bank Lenders do not know if they are receiving (a) any cash for their cash collateral; (b) the return of one boat or five boats, or the amount of any credit to be given; (c) any portion of exit financing measured by one boat or ten boats or some boats, or the value per boat; or (d) the amount of any deficiency claim or note, or

---

[17] "Active Vessels" means "<u>any one or more</u>" of the following: Gulf Pride; Gulf Breeze; Larry Moore; Master Everett; Gulf Storm; Gulf Quest; Gulf Fury; Miss Hayley; Miss Emma Jo; and Gulf Wind.
[18] "Retired Vessels" means "<u>any one or more</u>" of the following: Gulf Carrier; Gulf Sun; Gulf Scout; Miss Sydney; Gulf Service; and Gulf Provider.
[19] Disclosure Statement, p. 4 (emphasis added).
[20] If the Court values the 10 active vessels at more than $20 million, the Debtors may have to pay more than $20 million. The source of such funding is unclear. Admittedly, this part of the Plans is not so much vague treatment as it is simply not feasible.
[21] Notably, one of the retired vessels to be returned to Senior Bank Lenders is not the Senior Bank Lenders collateral, *i.e.*, the Gulf Sun. Presumably, its inclusion is a typographical error.
[22] There is no reference to collateral, so that the note is presumably unsecured.

collateral for any note. A document that does not provide "treatment" for the Senior Secured Class of claims hardly qualifies as a plan within the meaning of 11 U.S.C. § 1123(a)(3).[23]

19. There are no ongoing negotiations between the Senior Bank Lenders and the Debtors regarding the current Plans or any other proposed plan of reorganization.

20. Arguably, the Debtors have 60 days from December 13, 2010 (or until February 11, 2011) to solicit votes in connection with their Plans. By the Exclusivity Motion, the Debtors seek to extend the exclusive period ("Exclusivity") within which the Debtors may solicit acceptances of such plan for an additional 60 days or until April 11, 2011. The Senior Bank Lenders object to this request and ask that it be denied.

## ARGUMENT AND AUTHORITIES

21. Section 1121 of the Bankruptcy Code permits a chapter 11 debtor to file a plan of reorganization at any time.[24] During the 120-day period after commencement of a chapter 11 case, however, a debtor-in-possession has the exclusive right to file a plan. If the debtor files a plan during this 120-day period, then it also has the exclusive right to solicit acceptances of such plan within 180 days of case commencement.[25] If acceptance of the plan is not obtained, any party-in-interest may file a plan.[26]

22. Congress intended Section 1121 to strike a balance between (a) the presumption that a debtor should be given control, initially, over the plan process, and (b) the rights of creditors to "limit the delay that makes [them] the hostage of chapter 11 debtors."[27] The legislative history of Section 1121 reveals that the section was designed to effect a change from

---

[23] The Senior Bank Lenders reserve and expressly do not waive their belief and argument that the Plans filed December 13, 2010 does not qualify as plans under 11 U.S.C. § 1123 for the reason that they contain many uncertainties with respect to treatment of many classes, including most particularly the Senior Bank Lenders.
[24] 11 U.S.C. §1121(a).
[25] 11 U.S.C. § 1121(b).
[26] 11 U.S.C. § 1121.
[27] *See In re Timbers of Inwood Forest Assocs. Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987) (en banc), *aff'd sub nom.*, *United Sav. Assoc. of Texas vs. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365 (1988).

practice under former Chapter XI of the Bankruptcy Act whereby a debtor's ability to hold creditors "hostage" through the plan process was virtually unlimited:

> Of course, the bargaining position of the debtor under present Chapter XI may be further enhanced by the debtor's control of the business…The take-it-or-leave-it attitude on the part of the debtors as permitted by Chapter XI is fraught with potential abuse. The granting of authority to creditors to propose plans of reorganization and rehabilitation serves to eliminate the potential harm and disadvantages to creditors and democratizes the reorganization process.[28]

Further, Congress intended that debtors would be given the initial 120-day window to propose a plan and that, in the vast majority of cases, creditors would be given an equal opportunity to participate in the plan process thereafter:

> Proposed Chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it will be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days.[29]

23. Bankruptcy courts, however, are permitted to increase or decrease exclusivity periods upon request of a party-in-interest for "cause".[30] A request to extend exclusivity is a serious, rather than "routine," matter.[31] The party requesting to modify (either enlarge or decrease) the exclusivity periods under Section 1121(d) bears the burden of proving that "cause" exists.[32] A decision to extend exclusivity for "cause" is within the Bankruptcy Court's discretion, and is fact specific.[33] In determining whether to grant an extension of exclusivity, this Court must both "balance the potential harm to creditors," and "limit the delay that makes

---

[28] Bankruptcy Act Revision, Serial No. 27, Part 3, Hearings on H.R. 31 and H.R. 32, 94th Cong. 2d Sess. (March 29, 1976).
[29] H.R. Rep. No. 595, 95th Cong. 2d Sess. 231 – 232 (1978).
[30] 11 U.S.C. § 1121(d).
[31] *In re McClean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).
[32] *See In re R.G. Pharmacy Inc.*, 374 B.R. 484, 487 (Bankr. D.C. 2007).
[33] *In re Adelphia Communs. Corp.,* 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006).

creditors hostages of chapter 11 debtors."[34] As such, this Court must closely scrutinize the exclusivity extension request because "extensions are not to be granted neither [sic] routinely nor cavalierly."[35]

24. Although courts have applied a more lenient standard in determining whether to grant additional time to gain acceptance of a filed plan, the lenient standard is applied where creditors are "[n]o longer in the dark with respect to the debtor's intention, the creditors have a basis for decision, and can either accept the plan or fight extensions to the exclusivity period, in order to file a competing plan."[36]

25. Despite the filing of the Plans and Disclosure Statement, Comerica, along with the other creditors, remains in the dark. Neither the Plans nor the Disclosure Statement clearly reveal the Debtors' intentions. Whether the Debtors will obtain exit financing and in what amount is unknown. Likewise, whether the Debtors will actually sell the vessels or return them to their respective secured lenders is also unclear. Moreover, the Debtors failed to file all of the relevant exhibits referenced in the Plans and/or Disclosure Statement. Consequently, the creditors do not have a list of executory contracts to be assumed, the list of reserved causes of action, or the *pro forma* protections. Without this information, neither Comerica nor any of the other creditors has enough information upon which to formulate either a positive or negative opinion of the Debtors' Plans. Therefore, the Debtors' requested extension of exclusivity still has the potential for detrimental impact upon the creditors' bargaining positions and this Court should *not* apply a less stringent standard for cause.

26. Clearly the December 13, 2010 Plans were filed as "placeholders," designed to obtain for Debtors an extension of authority to use cash collateral and a statutory extension of

---

[34] *In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 453 (Bankr. W.D. 1987); *Timbers*, 808 F.2d at 372.
[35] *McLean Indus.*, 87 B.R. at 834.
[36] *In re Perkins,* 71 B.R. 294, 299 (W.D. Tenn. 1987).

exclusivity. A "placeholder" plan that provides no meaningful or intelligible treatment of the Senior Bank Lenders should not be countenanced.

27. Although the Bankruptcy Code does not explicitly define the meaning of "cause," bankruptcy courts have identified the following factors as useful in determining whether cause exists:

(a) the size and complexity of the case;
(b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
(c) the existence of good faith progress towards reorganization;
(d) whether the debtor is paying its bills as they become due;
(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;
(f) whether the debtor has made progress in negotiation with its creditors;
(g) the amount of time that has elapsed in the case;
(h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
(i) whether an unresolved contingency exists.[37]

28. This list of factors is not exhaustive; rather, it represents a means of ensuring that these factors are considered.[38] The overriding consideration above and beyond the list is whether termination will facilitate moving the case forward.[39] Some factors may be more relevant than others in a given case. The Debtors fail to present evidence that satisfies these factors, and, accordingly the requested extension of exclusivity should be denied.

### A. The Factors Favor Denial of the Requested Extension and Termination of Exclusivity.

29. *Size & Complexity.* Contrary to the Debtors' conclusory assertion in the Motion

---

[37] *See In re Dow Corning Corp.*, 208 B.R. 661, 664-665 (Bankr. E.D. Mich. 1997).
[38] *Adelphia,* 352 B.R. at 587.
[39] *Dow Corning,* 208 B.R. at 670.

that "these cases are relatively large [and] complex", this Case is neither extremely large nor unique. The Debtors are not a multi-national company; rather, they are a local business doing business solely in Louisiana (with one vessel being used internationally). On the Petition Date, the Debtors employed less than 150 employees and worked with 37 independent contractors.[40] The Debtors have been forced to reduce their workforce during the Case to respond to their declining operations which now consist of a mere 4 active vessels.

30. Likewise, nothing is unusual about the nature of the Debtors' business or the financial problems that resulted in their need to seek relief under Chapter 11. The Debtors have assets valued at $50-80 million (per the Senior Bank Lenders' appraisals) and liabilities of $66.6 million (excluding intercompany debt).[41] The number of creditors that the Debtors brought with them to this Court and the claims that they have against the Debtors and their assets are not particularly extraordinary.[42] The Debtors' major creditors are clearly defined as evidenced by the fact that only a handful of parties have had meaningful participation in the Case.

31. *Time.* The second factor weighs heavily in favor of termination of Exclusivity. The Debtors and Comerica have been negotiating over terms of a consensual plan since before the Petition Date. Upon information and belief, the Debtors have also been in negotiations with the Committee. Despite these negotiations, the parties have not reached a consensus on the terms of a consensual plan. As such, the parties have reached an impasse and have terminated negotiations. Extending Exclusivity will not change this impasse because the Debtors and their primary creditor disagree on the exit strategy.

32. *Good Faith Progress.* The third factor also favors termination of Exclusivity. "In

---

[40] *See* Debtors' *Motion for Authority to Pay Prepetition Wages, Compensation, and Employee Benefits* [Dkt. No. 15], ¶ 5-6.
[41] Amended Schedules, filed July 23, 2010.
[42] *See In re All Seasons Industries, Inc.,* 121 B.R. 1002, 1005-6 (Bankr. N.D. Ind. 1990).

virtually every case where an extension has been granted, the debtor showed substantial progress had been made in negotiations toward reorganization."[43] "The Debtors submit that they have made good faith progress towards reorganization."[44] Despite having filed the Plans and Consolidated Disclosure Statement, the Debtors are still unable to articulate their exit strategy or a timetable for progress toward reorganization in this Case. By the Debtors' own admission, they are not currently in a position to solicit votes. Rather, "the Debtors and their professionals require additional time to negotiate with potential new equity and lender which *may* participate in the Plans, and otherwise address issues relating to the Consolidated Disclosure Statement."[45] If other parties-in-interest have a viable strategy, they should be allowed to present such a strategy to the creditors.

33. *Viable Plan.* The fifth and most important factor in the Case is whether the Debtors have demonstrated reasonable prospects for filing a viable plan. The Debtors' Plans speak for themselves with their many uncertainties and unknowns. The Debtors have not secured a firm commitment for exit financing and/or a real cash infusion to reorganize. Thus the Plans filed cannot be confirmed. Comerica continues to believe (as the Senior Bank Lenders have since the beginning of this Case) that without the infusion of substantial capital, a sale of the Debtors' business or assets is the only viable plan for the reorganization of the Debtors' estates.

34. *Negotiations with Creditors.* The sixth factor also favors termination of Exclusivity. The Debtors, the Committee, and the Senior Bank Lenders, their primary creditors,

---

[43] *In re Mirant Corp.*, No. 4-04-CV-476-A, 2004 WL 2250986 at *2 (N.D. Tex. September 30, 2004) citing *In re Washington-St. Tammany Elec. C-Op., Inc.*, 97 B.R. 852, 854 (E.D. La. 1989).
[44] Exclusivity Motion, ¶ 9.
[45] Motion, ¶16 (emphasis added).

"have a good difference of opinion about the future prospect of the [Debtors'] business."[46] Accordingly, the parties are unlikely to be able to find a common ground upon which to structure a mutually satisfactory plan. The continuation of Exclusivity is not likely to change this state of affairs.[47] Allowing Exclusivity to continue will not likely result in [an amended] consensual plan.[48] Terminating Exclusivity will not distract from the parties' ability to negotiate a consensual reorganization; rather, it will level the playing field and allow the Senior Bank Lenders (and other creditors) to offer realistic options rather than to be held hostage to the Debtors' unrealistic Plans.

## CONCLUSION

35. The Court should not permit the filing of "placeholder plans" in order to obtain an extension of authority to use cash collateral and the benefit of a statutory extension of exclusivity. To grant an additional 60 days of exclusivity *on top of the statutory 60 days* would be unconscionable. A large majority, if not all, of the factors weigh in favor of or mandate the termination of Exclusivity. Additionally, termination satisfies the overriding consideration here because it will significantly move this Case forward. Denying an extension in this Case does not affect the Debtors' ongoing right to solicit votes in connection with their Plans. Other creditors, including Senior Bank Lenders should be allowed to protect their interests by coming forward with alternative plans.[49] Consequently, the Senior Bank Lenders submit that Exclusivity should terminate to permit creditors the opportunity to propose a plan in this Case.

---

[46] *Seasons*, 121 B.R. at 1006.
[47] *Id.*
[48] *See In re Express One Int'l*, 194 B.R. 98, 100-101 (Bankr. E.D. Tex. 1996) (finding that a debtor must also show that "the likelihood of agreement on a consensual plan if [the] debtor remains in control, the absence of alternative creditor plans which cannot be filed because of the debtor's exclusive right to propose and confirm a plan, and a showing that the debtor is not using exclusivity to force on its creditors its view of an appropriate plan.").
[49] *Id.* at 454.

OBJECTION OF COMERICA BANK TO THIRD EXCLUSIVITY MOTION – PAGE 14
017104 000414 HOUSTON 719116.5

10-50713 - #681  File 12/23/10  Enter 12/23/10 12:25:24  Main Document  Pg 14 of 16

## RESERVATION OF RIGHTS

36. Comerica expressly reserves all rights to assert additional objections to the Motion either at or before the hearing on the Motion. Additionally, Comerica reserves all rights to seek to terminate Exclusivity or to oppose future requests by the Debtors for further extensions of their exclusive periods to file a plan of reorganization or to solicit acceptances of same.

## PRAYER

**WHEREFORE**, Comerica Bank respectfully requests that the Court deny the Debtors' request to extend Exclusivity and grant Comerica such other and further relief as this court may deem proper, both at law and in equity.

**DATED:** December 23, 2010.

> **JONES, WALKER, WAECHTER, POITEVENT CARRERE & DENGRE, LLP**
>
> R. Patrick Vance
> Louisiana Bar Number 13008
> pvance@joneswalker.com
> Mark A. Mintz
> Louisiana Bar Number 31878
> mmintz@joneswalker.com
> 201 St. Charles Ave., 49th Floor
> New Orleans, Louisiana 70170-5100
> Telephone: (504) 582-8368
> Facsimile: (504) 589-8368

THOMPSON & KNIGHT LLP

*/s/ Demetra L. Liggins*
Rhett G. Campbell
Texas State Bar No. 03714500
rhett.campbell@tklaw.com
Demetra L. Liggins
Texas State Bar No. 24026844
demetra.liggins@tktlaw.com
Three Allen Center
333 Clay Street, Suite 3300
Houston, Texas 77002
Phone: (713) 654-8111
Facsimile: (713) 654-1871

**COUNSEL FOR COMERICA BANK**

**CERTIFICATE OF SERVICE**

I certify that on December 23, 2010, a copy of the foregoing document was served by to all parties entitled to service via this Court's Electronic Case Filing System ("ECF") and on the parties on the attached Service List by first class U.S. mail, postage prepaid, or by facsimile transmittal as indicated.

*/s/ Demetra L. Liggins*
One of Counsel

OBJECTION OF COMERICA BANK TO THIRD EXCLUSIVITY MOTION – PAGE 16
017104 000414 HOUSTON 719116.5

10-50713 - #681  File 12/23/10  Enter 12/23/10 12:25:24  Main Document  Pg 16 of 16