**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 10-50713** |
| **GULF FLEET HOLDINGS, INC., et al.** | § | **CHAPTER 11** |
| **DEBTORS** | § | **(Jointly Administered w/ Case Nos. 10-50714, 10-50715, 10-50716, 10-50717, 10-50718, 10-50719, 10-50720, 10-50721, 10-50722, 10-50723, 10-5042)** |
| **ALAN H. GOODMAN, TRUSTEE** | § | |
| **VS.** | § | **ADVERSARY NO. 11-05006** |
| **H.I.G. CAPITAL, LLC, BRIGHTPOINT CAPITAL PARTNERS MASTER FUND, L.P., GULF FLEET TIGER ACQUISITION, LLC, GULF FLEET FINANCING, LLC, ANTHONY TAMER, JEFF ZANARINI, JONATHAN FOX, AND STEADFAST INSURANCE COMPANY** | § | **JURY TRIAL REQUESTED** |

**COMPLAINT-IN-INTERVENTION**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 1

III. PARTIES ........ 2

- A. The Debtors. ........ 2
- B. The Plaintiff. ........ 2
- C. The Defendants. ........ 2

IV. FACTUAL BACKGROUND ........ 5

- A. HIG purchases Gulf Fleet in a leveraged-buy-out. ........ 5
- B. HIG dominated and controlled Gulf Fleet following the LBO. ........ 6
- C. HIG caused GF Acquisition to enter onerous contracts with HIG. ........ 7
- D. HIG undercapitalized Gulf Fleet. ........ 7
- E. GF Tiger Acquisition purchased the rights to the *M/V Gulf Tiger*. ........ 9
- F. HIG merged GF Acquisition and GOMS to eliminate potential fraudulent transfers. ........ 9
- G. GF Financing purchases Gulf Fleet's accounts receivable. ........ 10
- H. Gulf Fleet executes promissory notes to GF Financing. ........ 11
- I. HIG locks out Gulf Fleet's independent board members. ........ 13
- J. HIG Employees present materially false financials to existing and potential financiers. ........ 13
- K. HIG delays Gulf Fleet's bankruptcy filing. ........ 13

V. CORE BANKRUPTCY CAUSES OF ACTION ........ 14

- COUNT 1: FRAUDULENT TRANSFER UNDER §§ 544, 548, 550 ........ 14
- COUNT 2: RECHARACTERIZATION ........ 16
- COUNT 3: SUBORDINATION ........ 18

VI. RELATED CAUSES OF ACTION ........ 18

- COUNT 4: BREACH OF FIDUCIARY DUTY ........ 18
- COUNT 5: BREACH OF DUTY AND TORT ........ 20
- COUNT 6: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ........ 21

COUNT 7: DELICTUAL ACTION / CONVERSION ........ 22
COUNT 8: RESTITUTION AND UNJUST ENRICHMENT ........ 23
COUNT 9: QUANTUM MERUIT ........ 24
COUNT 10: PARTNERSHIP LIABILITY ........ 24
COUNT 11: SINGLE BUSINESS ENTERPRISE ........ 25
COUNT 12: DIRECT ACTION AGAINST STEADFAST ........ 27
COUNT 13: ATTORNEY'S FEES ........ 27
JURY DEMAND ........ 27

## I. NATURE OF THE ACTION

1. From May 2007 until Gulf Fleet's inevitable bankruptcy in May 2010, HIG dominated Gulf Fleet. HIG employees, serving as Gulf Fleet directors, caused Gulf Fleet to take actions that benefited HIG to the detriment of Gulf Fleet and its creditors. These actions included causing Gulf Fleet to enter into interested transactions with other HIG subsidiaries and providing value to them without remuneration. The Trustee files this Complaint-in-Intervention to recover from Defendants for the benefit of Gulf Fleet's creditors.

## II. JURISDICTION AND VENUE

2. The District Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157(a) & (b) as a matter arising in, arising under and/or related to these bankruptcy cases under Chapter 11 of Title 11 of the United States Code.

3. Pursuant to 28 U.S.C. § 157(b), this Court also has jurisdiction over non-core claims that arise out of these bankruptcy cases. The District Court also has jurisdiction over the pendant claims that arise out of these bankruptcy cases pursuant to 28 U.S.C. §§ 1334(b) and 1367.

4. The District Court has jurisdiction over each of the Defendants because each is a citizen of the United States and each has conducted business within the Western District of Louisiana, including business that gives rise to the claims asserted herein. In addition, Defendants HIG, Gulf Fleet Financing, and Brightpoint have filed proofs of claim in these bankruptcy cases giving the District Court jurisdiction over them.

5. The District Court has referred the matter to this Court under the Standing Order of Reference for the Western District of Louisiana.

6. Venue is proper in the Western District of Louisiana pursuant to 28 U.S.C. § 1409 because that is the place of filing of the Bankruptcy Cases.

## III. PARTIES

### A. The Debtors.

7. The Debtors are Gulf Fleet Holdings, Inc. (“GFH”), Gulf Fleet Management, LLC (“GF Management”), Gulf Fleet, LLC (“GF LLC”), Gulf Fleet Offshore, LLC (“GFO”), Gulf Fleet Marine, Inc. (“GF Marine”), Gulf Ocean Marine Services, LLC (“GOMS”), Gulf Service, LLC (“GS”), Gulf Wind, LLC (“Wind”), Gulf Worker, LLC (“Worker”), Hercules Marine, LLC (“Hercules”), and Star Marine, LLC (“Star”). For convenience, the Debtors (now substantially consolidated) may be referred to collectively as “Gulf Fleet” or the “Debtors”.

### B. The Plaintiff.

8. Plaintiff Alan H. Goodman (the “Trustee”) was appointed under the Joint Plan of Reorganization (“Plan”) to serve as the Trustee of the Gulf Fleet Liquidating Trust (the “Trust”). Pursuant to Article XI of the Plan, Gulf Fleet’s causes of action were transferred to the Trust. Further, the Trustee was appointed as a representative of Gulf Fleet’s estates under 11 U.S.C. § 1123(b) to pursue claims. The Trustee is the proper party to prosecute, defend against, and settle claims asserted in this lawsuit.

### C. The Defendants.

9. Defendant H.I.G. Capital, LLC (“HIG”) has filed proofs of claim in one or more of the above-captioned bankruptcy cases. The Summons and Complaint will be served upon HIG at the address listed on its proof of claim: c/o Linda M. Leali, Esq., White & Case, LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida, 33131 by U.S. first class mail, postage prepaid. Alternatively, under Fed. R. Bankr. P. 7004, HIG may be served by mailing the Summons and Complaint via U.S. first class mail, postage prepaid, to an officer of HIG at its principal place of business: 1450 Brickell Avenue, 31st Floor, Miami, Florida 33131.

10. Defendant Brightpoint Capital Partners Master Fund, L.P. ("Brightpoint") has filed proofs of claim in one or more of the above-captioned bankruptcy cases. Upon information and belief, Brightpoint is a wholly owned subsidiary of HIG and was at all times from the leveraged-buy-out ("LBO") until May 14, 2010 (the "Petition Date"). The Summons and Complaint will be served upon Brightpoint Capital Partners Master Fund, L.P. at the address listed on its proof of claim: c/o Steven J. Solomon, Esq., Gray Robinson, P.A., 1221 Brickell Avenue, Suite 1600, Miami, Florida, 33131 by U.S. first class mail, postage prepaid. Alternatively, under Fed. R. Bankr. P. 7004, Brightpoint may be served by mailing the Summons and Complaint via U.S. first class mail, postage prepaid, to an officer of Brightpoint at its principal place of business: 1450 Brickell Avenue, 31st Floor, Miami, Florida 33131.

11. Defendant Jeff Zanarini ("Zanarini"), a person of majority, is a Managing Director of HIG, who served as Director and Secretary of Defendant GFH, and will be served with process via Fed. R. Bankr. P. 7004 by mailing a copy of the Summons and Complaint to him via U.S. first class mail at 1001 Brickell Bay Drive, 27th Floor, Miami, Florida 33131.

12. Defendant Jonathan Fox ("Fox"), a person of majority, who served as Treasurer and Director of Defendant GFH, and will be served with process via Fed. R. Bankr. P. 7004 by mailing a copy of the Summons and Complaint to him via U.S. first class mail at 1001 Brickell Bay Drive, 27th Floor, Miami, Florida 33131.

13. Defendant Anthony Tamer ("Tamer"), a person of majority, is a Managing Partner of HIG, who served as President and Director of Defendant GFH, and will be served with process via Fed. R. Bankr. P. 7004 by mailing a copy of the Smmons and Complaint via U.S. first class mail at 1001 Brickell Bay Drive, 27th Floor, Miami, Florida 33131. (Tamer, together with Zanarini, and Fox, the "HIG Employees").

14. Defendant Gulf Fleet Financing, LLC ("GF Financing") has filed proofs of claim in one or more of the above-captioned bankruptcy cases. Upon information and belief, GF Financing is a wholly owned subsidiary of HIG and was at all times from the LBO until the Petition Date. The Summons and Complaint will be served upon GF Financing at the address listed on its proof of claim form: c/o White & Case, LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida, 33131 by U.S. first class mail, postage prepaid. Alternatively, under Fed. R. Bankr. P. 7004, GF Financing may be served by mailing the Summons and Complaint via U.S. First Class mail, postage prepaid, to an officer of GF Financing at its principal place of business: 1450 Brickell Avenue, 31st Floor, Miami, Florida 33131.

15. Defendant Gulf Fleet Tiger Acquisition, LLC ("GF Tiger Acquisition"), upon information and belief, is a wholly-owned subsidiary of HIG and was at all times from the LBO until the Petition Date. The Summons and Complaint will be served upon GF Tiger Acquisition at the address listed on its proof of claim form: c/o White & Case, LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida, 33131 by U.S. first class mail, postage prepaid. Alternatively, under Fed. R. Bankr. P. 7004, GF Financing may be served by mailing the Summons and Complaint to it via U.S. First Class mail, postage prepaid, to an officer at its principal place of business: 1450 Brickell Avenue, 31st Floor, Miami, Florida 33131. (GF Tiger Acquisition, together with GF Financing, and Brightpoint, the "HIG Subsidiaries").

16. Defendant Steadfast Insurance Company ("Steadfast") is a Delaware corporation with its principal place of business outside of Louisiana that issued an insurance policy to Gulf Fleet. Steadfast can be served via Fed. R. Bankr. P. 7004 via U.S. first class mail and/or La. R.S. § 22:335 by service through the Louisiana Secretary of State. In accordance therewith, the Complaint and a Summons will be mailed to Steadfast at its principal place of business by U.S.

first class mail at 1400 American Lane, Schaumburg, Illinois 60196-1056 or 1 Liberty Plaza, 30th Floor, New York, New York 10006.

## IV. FACTUAL BACKGROUND

17. In 1999, Mike Hillman ("Mr. Hillman") and Darlene Hillman (together, the "Hillmans") formed the predecessor to the Debtors to provide offshore transportation and other services to oilfield operators. Gulf Fleet owned and operated a fleet of offshore service vessels that transported supplies and crews from the Gulf Coast to rigs operating in the Gulf of Mexico. Mike and Darlene Hillman were the sole owners of Gulf Fleet until May 1, 2007.

18. On May 1, 2007, the Hillmans sold 65% of their stake in Gulf Fleet to HIG as part of a leveraged-buy-out ("LBO") transaction. The deal gave HIG absolute control of Gulf Fleet in exchange for nothing, which led to the financial ruin of Gulf Fleet.

### A. HIG purchases Gulf Fleet in a leveraged-buy-out.

19. In the LBO the Hillmans agreed to sell 100% of their ownership interests in GF Management, GFO, GOMS, GF LLC, Worker, Hercules and Star (collectively, the "Business") for $23.5 Million in cash and other consideration, including but not limited to a 35% equity interest in the new Gulf Fleet.

20. In order to fund and close the transaction, HIG caused Gulf Fleet to pledge its assets as collateral for a substantial loan (the "Senior Loan") from a syndicate of bank lenders led by Comerica Bank ("Comerica"). The Senior Loan contemplated that Gulf Fleet could borrow up to $52 Million,[1] and Gulf Fleet immediately borrowed $46 Million of this amount.[2]

---

[1] According to Section 1.1 of the Senior Note, Gulf Fleet received a revolving credit aggregate commitment of $10 Million and term debt of $42 Million.

[2] According to the May 1, 2007 balance sheet, Gulf Fleet borrowed $42 Million as term debt and immediately borrowed $4 Million under the revolver.

21. In addition, Brightpoint, an HIG Subsidiary, agreed to loan an additional $6 Million to Gulf Fleet on a subordinated basis to the Senior Loan (the "Brightpoint Note"). The Brightpoint Note had an interest rate of 14% and no principal repayment until the maturity date of May 1, 2012.

22. Gulf Fleet was obligated to pay 8% of interest quarterly with the remaining 6% accumulated to be repaid on the maturity date.

23. Gulf Fleet used the loans to settle Gulf Fleet's substantial pre-existing debt and to fund the Hillmans' $23.5 Million purchase price. Despite the substantial sum, Gulf Fleet retained only $500,000 cash after these transactions.

**B. HIG dominated and controlled Gulf Fleet following the LBO.**

24. After the LBO in which HIG made no financial contribution of any value, HIG owned 65% of Gulf Fleet. HIG then appointed Fox, Zanarini, and Tamer to the boards of directors of various Debtor entities. HIG at all times asserted to Mr. Hillman that it was in control of Gulf Fleet. The HIG Employees acted in the best interests of HIG, not Gulf Fleet. They entered into prohibited transactions with HIG and its wholly owned entities without seeking approval from disinterested board members or obtaining fairness opinions. Further, HIG Employees prevented independent directors (i.e., Mr. Hillman) from attending vital board meetings and withheld vital information. On at least one occasion the Board acted without a meeting or waiver of meeting in order to prevent Mr. Hillman from exercising his rights as a director.

25. The HIG Employees and other agents of HIG permitted confidential and proprietary Gulf Fleet information (such as day rates, financial information, client and vendor lists) to leak to competitors, such as Rigdon Marine, which owns Jackson Marine, a direct competitor. HIG did so in an effort to sell the enterprise, even though doing so injured the

insolvent and undercapitalized Debtors. In the end, Jackson Marine declined the purchase offer, continued to compete with Gulf Fleet, and purchased two of the Gulf Fleet vessels at the liquidation auction.

**C. HIG caused GF Acquisition to enter onerous contracts with HIG.**

26. Immediately following the LBO, HIG caused Gulf Fleet Acquisition (later GOMS) to enter into two contracts with HIG: (i) the Professional Services Agreement ("PSA") and (ii) the Consulting Services Agreement ("CSA"). Under the two contracts, HIG was to provide professional advice and evaluation for potential acquisitions. HIG earned a flat annual management fee of $500,000 under the CSA in addition to other advisory fees or fees pursuant to letter agreement. HIG earned a 1% commission on any transactions under the PSA.

27. HIG provided no value to Gulf Fleet for these arrangements. These agreements were never the subject of a third party fairness opinion. The agreements were an artifice used to funnel money from Gulf Fleet to the other arms of the HIG enterprise. When making these payments, the HIG Employees did not seek or obtain approval from a disinterested director. Gulf Fleet paid hundreds of thousands of dollars to HIG and its affiliates under these contracts.

**D. HIG undercapitalized Gulf Fleet.**

28. Gulf Fleet faced repeated liquidity crises because of undercapitalization. In February of 2008, Gulf Fleet acquired the Gulf Sun for $4 Million, but lacked the ability to pay the purchase price. As a result, Mr. Hillman and HIG made an unsecured loan to the Debtors for the purchase of $4 Million. This "loan" was not according to any ordinary credit terms. The

terms were not objectively fair and were not negotiated. The Debtors made no payments on this loan until October of 2008.[3]

29. In July of 2008, to raise operating capital, Gulf Fleet sold its rights in a vessel construction contract to an entity owned by HIG and Mr. Hillman for $8,000,000. This transaction is described more fully in section IV. E., below.

30. In June of 2009, the undercapitalization and insolvency were so severe that Gulf Fleet was unable to make payroll without infusions of cash from the other arms of the HIG enterprise.

31. Also in 2009, eight vessels needed dry-docking and ABS certifications. Gulf Fleet had insufficient capital reserves to pay for these services. As a result the vessels sat idle and lost work and the cash flow picture deteriorated.

32. In an emergency move to raise cash, on September 3, 2009, Gulf Fleet agreed to sell accounts receivable to GF Financing as part of a factoring facility. At the time, the HIG Employees knew (or should have known) that the factoring agreement violated the terms of the senior debt facility and jeopardized Gulf Fleet's entire business.

33. Four months later on January 13, 2010, Gulf Fleet converted the $2.9 Million in accounts receivable sold under the factoring agreement to a subordinated convertible note and borrowed another $5.4 Million from GF Financing. This transaction is described more fully in section IV. G., below.

34. Gulf Fleet's bankruptcy was caused, in part, by HIG's failure to adequately capitalize Gulf Fleet.

[3] This note was refinanced in October 2008 and converted from an unsecured note to a collateralized bank loan at a higher interest rate. The Debtors paid off this insider unsecured note at a time they had unreasonably small capital to do business and/or were insolvent.

## E. GF Tiger Acquisition purchased the rights to the *M/V Gulf Tiger.*

35. On July 31, 2007, Gulf Fleet entered into an agreement with Thoma-Sea Ship Builders, LLC ("Thoma-Sea") for the construction of an offshore supply vessel, the *M/V Gulf Tiger* for approximately $17.975 Million (the "Construction Contract"). Under the terms of the Construction Contract, Gulf Fleet paid $4 Million to Thoma-Sea as a deposit for construction of the vessel.

36. On July 27, 2008, Gulf Fleet assigned all of its rights to the Construction Contract to GF Tiger Acquisition, an HIG Subsidiary. GF Tiger Acquisition paid $8 Million to Gulf Fleet and immediately received the benefits of the $4 Million deposit and all of the other benefits in the Construction Contract.

37. After the assignment, Gulf Fleet continued to pay for the *M/V Gulf Tiger's* construction despite no longer having any interest in the vessel. Gulf Fleet provided over $1 Million in equipment, materials, and labor to Thoma-Sea in connection with construction of the *M/V Gulf Tiger* for the benefit of GF Tiger Acquisition and HIG. In addition, HIG Employees utilized, or permitted the use of, Gulf Fleet employees to work on the *M/V Gulf Tiger*. GF Tiger Acquisition never reimbursed or compensated Gulf Fleet. At all times, HIG directed Gulf Fleet employees to make these payments with assurances that HIG would repay Gulf Fleet.

## F. HIG merged GF Acquisition and GOMS to eliminate potential fraudulent transfers.

38. On March 23, 2009, Gulf Fleet Acquisition, Inc. ("GF Acquisition") merged with GOMS. According to the Certificate of Merger filed with the State of Louisiana, Fox, an HIG Employee, executed the document for both GF Acquisition and GOMS. Upon information and belief, HIG directed the merger in order to avoid liability for abusing the corporate form and incurring intercompany receivables owed by GF Acquisition to one or more of the Debtors.

39. Mr. Hillman, a board member and shareholder at the time, claims he was never notified of the merger.

**G. GF Financing purchases Gulf Fleet's accounts receivable.**

40. In September 2009, Gulf Fleet's severe lack of liquidity began to create issues between Gulf Fleet and its trade creditors, who threatened to place liens on Gulf Fleet's vessels. Further, the trade creditors demanded more stringent credit protections, including prepayment of accounts and refusal to provide further services absent payment of back-due accounts. Instead of contributing equity, HIG decided to factor Gulf Fleet's receivables to a wholly owned entity, GF Financing. On September 3, 2009, GF Financing and Gulf Fleet entered into a factoring agreement (the "Factoring Agreement") over the objection of Mr. Hillman.

41. HIG was on both sides of the Factoring Agreement. The Factoring Agreement provided that GF Financing, formed two days before, would purchase up to $4.0 Million in accounts receivable from Gulf Fleet. Zanarini signed the Factoring Agreement on behalf of GF Financing, and Fox signed on behalf of Gulf Fleet. Further, HIG required equity-owners to personally guarantee the accounts receivable purchased, limited to the percentage of equity that they owned.[4] On November 24, 2009, Gulf Fleet sold $2,897,400 in accounts receivable to GF Financing.

42. On November 24, 2009, Zanarini, as Vice President of GFH, signed the Notice of Sale of Assets stating that GFH sold accounts with a face amount of $2,896,582.78 to GF Financing for $2,897,400.

43. The Factoring Agreement violated the Senior Loan's covenants, which specifically prohibited Gulf Fleet from selling its collateral without permission from Comerica.

---

[4] Mr. Hillman guaranteed payment on 34% of the factored accounts, Michael Prejean guaranteed payment on 1% of the factored accounts, and Peter Fortier guaranteed 1% of the factored accounts. HIG may not have guaranteed its 64% share.

After discovering the sale, Comerica immediately demanded that its collateral be returned. In response, HIG amended the Factoring Agreement. The Amended Factoring Agreement, dated December 3, 2009, provided that GF Financing would return all of the accounts purchased on November 24 in exchange for accounts that GF Financing would select in the future. The Amended Factoring Agreement further provided that any future accounts selected by GF Financing would be "Ineligible Accounts" as defined in the Senior Loan documents, apparently to obtain or obviate the need for Comerica's approval.[5]

44. The Factoring Agreement and the Amended Factoring Agreement were non-recourse, and GF Financing did not have the ability to seek payment from GFH to the extent they were unable to collect receivables due on the Ineligible Accounts. HIG had the right to select Ineligible Accounts but did not otherwise have a right to payment from GFH or any of the Debtors. Both Factoring Agreements had HIG directing HIG Employees to sign for both the borrower and lender. The agreements were not approved by disinterested board members. No third party fairness opinion was obtained. HIG did not make a capital contribution but rather continued to keep the Debtors undercapitalized and over-leveraged.

**H. Gulf Fleet executes promissory notes to GF Financing.**

45. HIG required the HIG Employees to sign promissory notes on behalf of the Debtors in favor of an HIG affiliate. A mere four months after the Factoring Agreement, Gulf Fleet again ran short on cash. HIG again refused to contribute equity. Instead, on January 13, 2010, GF Financing loaned Gulf Fleet $5,452,600 pursuant to a promissory note (the "$5.5M Note"). Simultaneously, Gulf Fleet issued a second promissory note to GF Financing for

---

[5] The Trustee does not know if Gulf Fleet sold additional accounts to GF Financing after the November 24th sale. Upon information and belief, they did not. The Trustee's counsel has heard, but not seen documentary evidence, that some receivables generated by the *M/V Gulf Scout* in Trinidad may have been pledged, albeit not collected by the factor.

$2,897,400 (the "$2.9M Note"). Upon information and belief, Gulf Fleet executed the $2.9M Note to serve as a substitute for Gulf Fleet's obligations under the Amended Factoring Agreement, despite the fact that Gulf Fleet had no obligation to cure shortfalls.

46. The $5.5M Note and $2.9M Note have identical terms:

- The notes have a maturity date of March 1, 2012.
- The notes have an interest rate of 15%, compounded quarterly. The interest is payment-in-kind meaning that interest accumulated until the maturity date.
- The notes are subordinated to the Senior Loan and the Brightpoint Note. Further, GF Financing could not bring an action to collect without Comerica's permission.
- At any time before the maturity date, GF Financing had the right to convert the balance of the notes into stock in GFH for $10 per share. Consequently, GF Financing had the right to obtain 840,000 shares in Gulf Fleet. This would give GF Financing unfettered control over Gulf Fleet; there were only 100,000 shares outstanding when GF Financing issued the notes.

47. Again, no third-party fairness opinion was obtained. HIG directed both sides of the transaction. The terms of the notes were not negotiated at arms-length.

48. These notes created a win-win situation for HIG. Gulf Fleet had no obligations until the maturity date of the notes. If Gulf Fleet stabilized and found success, then HIG could convert the notes. This would be a *de facto* equity contribution and Gulf Fleet would not suffer any cash consequence, such as having to pay back the notes, or any tax consequences due to loan forgiveness. On the other hand, if Gulf Fleet failed, as it did, GF Financing and/or HIG would be creditors in a bankruptcy and could realize a more substantial recovery on these notes.

49. Thus, HIG created the perfect investment vehicle. If Gulf Fleet succeeded, the notes would become an equity contribution and HIG would own nearly all of Gulf Fleet. If Gulf Fleet failed, the notes would remain unsecured debt and entitle HIG to a claim against the estate.

## I. HIG locks out Gulf Fleet's independent board members.

50. On March 1, 2010, the HIG Employees arranged for the Gulf Fleet board of directors to hold a meeting on that day. The only notice they provided to Mr. Hillman was an email sent on March 1. Mr. Hillman could not attend and the HIG Employees proceeded without him. Grant Hillman was given notice, but not allowed to speak.

51. Similarly, the HIG Employees arranged for the Gulf Fleet board of directors to hold a meeting on May 14, 2010 with full knowledge that Mr. Hillman would be traveling. Although the HIG Employees gave Mr. Hillman inadequate notice of the meeting, Mr. Hillman attempted to attend the meeting telephonically. The telephonic conference failed and Mr. Hillman was once again kept out of a corporate board meeting.

## J. HIG Employees present materially false financials to existing and potential financiers.

52. Under the terms of the Senior Loan, Gulf Fleet was obligated to present regular reports regarding its financial position. The HIG Employees caused Gulf Fleet to submit incorrect financial reports to hide its financial weakness and prolong Gulf Fleet's insolvency.

53. In addition, Gulf Fleet attempted to find additional financing from RBS Business Capital ("RBS") beginning in September 2009. Again, the HIG Employees caused Gulf Fleet to submit reports and projections in an effort to secure future investment. Upon information and belief, the negotiations with RBS failed due to misrepresentations/inaccuracies in the reports or projections.

## K. HIG delays Gulf Fleet's bankruptcy filing.

54. HIG began planning to put Gulf Fleet into bankruptcy in October 2009. HIG directed Gulf Fleet to retain bankruptcy counsel. Planning went so far as to prepare a petition and schedules for a filing in Delaware in the fall of 2009.

55. Despite its significant liquidity issues, HIG and the HIG Employees delayed Gulf Fleet's bankruptcy until May 14, 2010. The latest date under Louisiana State law to avoid and recover revocatory transfers, such as the LBO, is usually three years from the date of the transaction. That date was on or about May 1, 2011.

56. In the LBO, HIG acquired a dominant ownership position in Gulf Fleet in exchange for making a minimal financial contribution. HIG was the classic recipient of value in an LBO. HIG and the HIG Employees used their position of control and domination and persuasion over the Debtors to delay the bankruptcy filing until they knew that they were safe from being forced to return their substantial—and cost-free—equity stake in Gulf Fleet.

57. During the period between the absolute need for the Debtors to file and the actual filing, the HIG Employees continued to operate the Debtors in a manner that ensured the deepening insolvency of the Debtors. Specifically, no serious efforts were taken to reduce negative cash flow, the Debtors did not change capital structure, assets were not aggressively marketed, and the HIG Employees made only token changes to accommodate cash-hemorrhaging Debtors.

## V. CORE BANKRUPTCY CAUSES OF ACTION

### COUNT 1: FRAUDULENT TRANSFER UNDER §§ 544, 548, 550

58. Under 11 U.S.C. §§ 544 and 550 and La. Civ. Code Ann. art. 2036 (West 2011), a trustee may avoid (annul) transfers of property from a debtor, or the incurrence of an obligation of the debtor, made within three years before the petition date, for which the debtor did not receive reasonably equivalent value, and that was made while the debtor was insolvent, that

rendered the debtor insolvent, or that left the debtor undercapitalized. Fraudulent transfer actions are known in Louisiana law as a revocatory action.[6]

59. Similarly, under 11 U.S.C. §§ 548 and 550, a trustee may avoid those transfers made while insolvent or that rendered a debtor insolvent, and for which the debtor did not receive reasonably equivalent value within two years of the petition date. Alternatively, a trustee may avoid transfers of the assets of, or the incurrence of an obligation by, a debtor with actual intent to hinder, delay, or defraud the creditors of that debtor.

60. From the LBO to the Petition Date, Gulf Fleet was regularly undercapitalized and relied on substantial infusions of capital to meet standard business expenses. After the LBO, Gulf Fleet only had $500,000 cash-on-hand and no unencumbered accounts receivable.[7] Further, because of the Senior Loan and the Brightpoint Note, Gulf Fleet could not obtain other financing. Together, the Senior Loan and Brightpoint Note leveraged Gulf Fleet for $58 Million when the parties allege Gulf Fleet's vessels and fixed assets totaled $59.4 Million.

61. The Senior Loan included strict negative covenants that prevented Gulf Fleet from selling its assets.[8] Gulf Fleet's liabilities soon exceeded the value of its assets. After the LBO, HIG received fraudulent transfers from Gulf Fleet in several forms:

- Gulf Fleet paid HIG pursuant to the terms of the PSA and CSA but did not receive any measurable benefit from the agreements. Instead, Gulf Fleet regularly paid HIG because it was an equity owner and controlled the board of directors. Accordingly, Gulf Fleet did not receive any equivalent value for these transfers.

- Gulf Fleet provided at least $1 Million in equipment, materials, and labor to Thoma-Sea in connection with construction of the *M/V Gulf Tiger* for the benefit of GF Tiger Acquisition. Gulf Fleet was not obligated to make those

6 *Farm Credit Bank of Texas v. Vallee*, 148 B.R. 1021, 1022-23 (W.D. La. 1992).

7 Without accounts receivable, Gulf Fleet could not borrow under the Senior Loan's revolving provision. Senior Loan, at § 2.4.

8 Senior Loan, at § 8.

payments and it never received reimbursement from GF Tiger Acquisition. Accordingly, GF Tiger Acquisition received at least a $1 Million fraudulent transfer.

- Even though undercapitalized and insolvent, Gulf Fleet repaid a $4 Million insider "loan".

- HIG charged over $500,000 to Gulf Fleet for legal fees and expenses incurred by HIG in connection with certain business transactions including, but not limited to, the acquisition of Gulf Fleet. Gulf Fleet was not obligated to pay these expenses and did not receive value for the expenditures.

- Upon information and belief, Gulf Fleet reimbursed the HIG Employees for travel and other business expenses that were not associated with Gulf Fleet business. Accordingly, Gulf Fleet was not obligated to pay these expenses.

- The issuance of the $2.9M Note was also a fraudulent transfer. GF Financing never paid Gulf Fleet reasonably equivalent value for the $2.9 Million. Instead, HIG caused Gulf Fleet to issue the $2.9M Note to compensate GF Financing for its losses under the Amended Factoring Agreement. The Amended Factoring Agreement was non-recourse; GF Financing's only source of payment was the selected ineligible accounts receivable. Further, *all* of the Gulf Fleet entities executed the note, but only Gulf Fleet Holdings was liable under the Amended Factoring Agreement. Accordingly, Gulf Fleet executed the $2.9M Note for no reasonably equivalent value.

- The $2.9M Note was an attempt to shield Gulf Fleet's assets from claims of creditors and is a fraudulent transfer. The transfer was made with the intent to hinder and delay Gulf Fleet's creditors from collecting on assets that they otherwise would have been entitled to. Thus, the Trustee may avoid the transfer as an actual fraudulent transfer of the assets of, or incurrence of an obligation by, the Debtors with actual intent to hinder and delay its creditors.

62. In accordance with 11 U.S.C. §§ 544, 548, 550, the Trustee is entitled to recover the amount of the fraudulent transfers, which include the incurrence of debt, along with pre- and post-judgment interest and costs and reasonable attorney's fees and costs.

**COUNT 2: RECHARACTERIZATION**

63. Under 11 U.S.C. § 105(a) and/or applicable non-bankruptcy law, a court may recharacterize loans made by equity-owners to a company as equity contributions. Here, HIG,

Gulf Fleet's controlling shareholder, made several loans to Gulf Fleet through the HIG Subsidiaries.

64. For the following reasons, the Court should recharacterize the $2.9M Note and the $5.5M Note:

- As described above, Gulf Fleet was over-leveraged and under-capitalized. It was destined to fail absent new equity. No other reasonable creditor would lend to Gulf Fleet because it was so over-leveraged.
- There was no security for the notes. Further, there were no negative covenants to protect the debt. In addition, the notes were subordinated.
- GF Financing could convert the notes upon demand and seize total control over Gulf Fleet.
- Gulf Fleet had no obligations until the maturity date. Gulf Fleet never paid any interest, but instead accumulated more indebtedness due to PIK interest.
- GF Financing required Comerica's permission to enforce any of the notes.

65. As described above, HIG structured the $2.9 Note and the $5.5M Note as a "heads-HIG-wins, tails-creditors-lose" situation. If Gulf Fleet succeeded, GF Financing could convert the notes into equity and dilute all of the other equity-owners, leaving HIG with over 95% of the equity in Gulf Fleet. If Gulf Fleet failed, GF Financing would not convert, leaving HIG with a substantial claim against the Gulf Fleet estate. This inequitable transaction meant HIG reaped all the reward, while the unsecured creditors bore a substantial risk. Equity demands that HIG accept the downside of equity ownership as well as the upside.

66. The Court should recharacterize HIG's $700,000 claim for contract damages under the CSA and PSA as an equity contribution. HIG did not attempt to recover its claim until after bankruptcy.

67. Accordingly, under general principles of equity and pursuant to 11 U.S.C. § 105(a), all of the amounts listed above should be recharacterized as equity contributions.

## COUNT 3: SUBORDINATION

68. For the reasons set forth herein, under 11 U.S.C. § 510(b) and (c), the CSA and PSA claims, the Brightpoint Note, the $5.5M Note, the $2.9M Note, and HIG's $700,000 CSA/PSA contract claim should be equitably subordinated or subordinated as a matter of law..

69. As controlling shareholder, HIG dominated Gulf Fleet. Accordingly, it had fiduciary duties to Gulf Fleet's minority shareholders and to Gulf Fleet's creditors while Gulf Fleet was insolvent. Despite these duties, HIG caused Gulf Fleet to execute obligations in favor of the HIG Subsidiaries instead of making new equity contributions. Further, HIG refused to obey its corporate duties by holding board meetings and informing all directors, including non-HIG directors, of future activities. These acts harmed Gulf Fleet and its shareholders by denying them their rights under the articles of incorporation, and creditors by dominating the company to the exclusive benefit of HIG.

70. Because HIG's inequitable conduct harmed the general unsecured creditors, HIG's claims should be subordinated below general unsecured creditors.

# VI. RELATED CAUSES OF ACTION

## COUNT 4: BREACH OF FIDUCIARY DUTY

71. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

72. As directors, Zanarini, Fox, and Tamer owed fiduciary duties to Gulf Fleet, its shareholders, and its creditors when the company was in the zone of insolvency. Specifically, these HIG Employees had a duty of loyalty. They had the duty to ignore their "other" employer, HIG, and act in the best interests of Gulf Fleet.

73. HIG also owed duties to Gulf Fleet. As the controlling shareholder and/or parties in control of Gulf Fleet, HIG owed fiduciary duties to and/or had a special relationship with Gulf

Fleet and its minority shareholders. Moreover, because Gulf Fleet was insolvent or in the vicinity or zone of insolvency, HIG owed fiduciary duties to Gulf Fleet's creditors, including a duty of loyalty.

74. As set forth above, HIG and the HIG Employees breached their fiduciary duties by, without limitation, the following:

- Acting in bad faith and for the interests of HIG instead of Gulf Fleet.
- Causing Gulf Fleet to provide over $1 Million in equipment, services, and labor to Thoma-Sea for the benefit of GF Tiger Acquisition without any compensation or reimbursement.
- Causing Gulf Fleet to pay over $500,000 for legal fees and expenses incurred by HIG in connection with certain business transactions including, but not limited to, HIG's acquisition of Gulf Fleet.
- Causing Gulf Fleet to enter into the CSA and the PSA with HIG, whereby Tamer signed for both HIG *and* Gulf Fleet.
- Causing Gulf Fleet to enter into a transaction that breached covenants between Gulf Fleet and its senior lenders for the benefit of HIG.
- Causing Gulf Fleet to reimburse the expenses of the HIG Employees for travel unrelated to Gulf Fleet business.
- Causing Gulf Fleet and its subsidiaries to execute the Brightpoint Note on terms that were outside of the industry's standard.
- Causing the company to continue to lose value and deepen its insolvency during the period after which it was clear that the Debtors should file bankruptcy, yet not making genuine attempts to stem the insolvency.
- Causing Gulf Fleet and its subsidiaries to execute the $2.9M Note to GF Financing without compensation and on terms that no reasonable company would accept.
- Causing Gulf Fleet and its subsidiaries to execute the $5.5M Note to GF Financing without compensation and on terms that no reasonable company would accept.
- Failing to obey corporate formalities under Delaware law, including requirements for holding board meetings and informing non-HIG directors of corporate decisions and the board meetings that did occur.

- Making misrepresentations to Gulf Fleet and minority shareholders of Gulf Fleet who relied on such representations to their detriment.
- Negligent and grossly negligent management of Gulf Fleet.

75. Upon information and belief, neither HIG, nor the HIG Employees ever obtained the necessary fairness opinions and/or disinterested approvals necessary for these transactions under Delaware law. Accordingly, they are interested transactions that do not meet the standard of complete fairness.

76. These breaches of fiduciary duty helped cause the Gulf Fleet bankruptcy and deprived the estates of valuable consideration. Accordingly, the Trustee is entitled to damages.

**COUNT 5: BREACH OF DUTY AND TORT**

77. The HIG Employees, at the direction of HIG, deliberately caused financial harm and deepened the insolvency of the Debtors while in charge of Gulf Fleet. They chose to cease servicing the CSA and PSA, which increased the debt load and decreased reorganization prospects. They chose to cease payments on the Brightpoint Note, compounding interest at the sub-prime rate of 14%. They chose not to file the Chapter 11 when a reasonably prudent director would.

78. Additionally, the deliberate deepening of the insolvency was a breach of the duty of loyalty. The Senior Loan collected interest for an additional five months. Comerica took action to enforce its rights unimpeded by a Chapter 11. The $5.5M Note and $2.9M Note both collected 14% interest for five months. The HIG Employees' actions resulted in numerous material covenant defaults with the Senior Loan lenders.

79. The HIG Employees were aware of the Debtors' irretrievable insolvency in December 2009. They refused to take prompt action and instead took actions designed to make Gulf Fleet more insolvent and less stable.

80. The HIG Employees owed a duty to Gulf Fleet's creditors as well as shareholders upon notice that the company was insolvent. The HIG Employees breached that duty by not taking action in the Debtors' best interests. They acted contrary to the interests of the Debtors. By delaying the filing of Chapter 11, HIG and the HIG Employees hoped to avoid liability for the improper LBO and undercapitalization of the Debtors.

81. HIG kept Gulf Fleet afloat as part of a scheme to take advantage of a hopelessly crippled company. HIG never intended to collect on the Notes. Rather, it intended to convert the Notes and seize total control of Gulf Fleet. This was the sole purpose of keeping Gulf Fleet out of bankruptcy; a self-dealing attempt to take control of the company. HIG sacrificed the interests of good faith trade creditors through its self-dealing.

82. La. Civ. Code art. 2315 provides in relevant part that "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Likewise, Delaware law imposes a non-waivable duty of loyalty to the entity. The choices of the HIG Employees wronged the Debtors and their creditors, which mandate a remedy at equity. The Court should fashion a remedy to make the Debtors and their creditors whole for the self-interested violation of their duties to creditors by refusing to cease business or seek a timely reorganization.

**COUNT 6: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

83. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

84. To aid and abet a breach of fiduciary duty committed by corporate directors is actionable under Delaware law.[9] The HIG Employees had fiduciary duties to Gulf Fleet.

[9] *Gatz v. Ponsoldt*, 925 A.2d 1265, 1275-76 (Del. 2007).

Nonetheless, they directed Gulf Fleet to take actions that benefited HIG at Gulf Fleet's expense. HIG knowingly participated in this breach, which harmed Gulf Fleet and its estates.

85. Because of HIG's involvement, Gulf Fleet paid $1 Million on HIG's behalf to GF Tiger Acquisition without reimbursement or compensation; paid over $500,000 on HIG's behalf for legal fees not for Gulf Fleet's benefit; executed notes without consideration; and entered into contracts without consideration. Gulf Fleet was harmed before the bankruptcy and the estate suffers still. Accordingly, HIG is liable for damages.

**COUNT 7: DELICTUAL ACTION / CONVERSION[10]**

86. The Trustee incorporates each of the above allegations by reference as if set forth fully herein. The following acts constituted delictual acts by HIG for which the Trustee is entitled to recover:

- Causing Gulf Fleet to provide $1 Million in equipment and services for GF Tiger Acquisition's benefit without compensation or reimbursement.
- Causing Gulf Fleet to pay over $500,000 in legal fees on HIG's behalf without any benefit or remuneration.
- Causing Gulf Fleet to execute a $2.9M Note for no consideration because Gulf Fleet was under no obligation under the Factoring Agreement or Amended Factoring Agreement to provide GF Financing with any replacement collateral for the accounts receivable.

As a result of these conversions, Gulf Fleet and its creditors lost value. Gulf Fleet is at least $1.5 Million poorer.

87. Further, the unsecured creditors must share their recovery with HIG. The Trustee is entitled to recovery of the $1.5 Million, plus costs and expenses of recovery. Likewise, the Trust is entitled to the avoidance of the indebtedness to HIG for the $2.9M note. The Trust is entitled to a money judgment for legal fees paid for the benefit of HIG.

[10] To the extent that HIG or the HIG Employees may have committed the tort of conversion in a common law jurisdiction, the Trustee brings claims for the tort of conversion.

88. As conversion is the intentional taking of a debtor's assets, the Trust is entitled to an award of such punitive damages as are permitted by law.

**COUNT 8: RESTITUTION AND UNJUST ENRICHMENT**

89. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

90. Gulf Fleet provided $1 Million of benefits to Thoma-Sea that benefited the HIG Subsidiary, GF Tiger Acquisition. Gulf Fleet had no obligation to provide the equipment, services, and labor. Accordingly, GF Tiger Acquisition and HIG were unjustly enriched.

91. Gulf Fleet paid over $500,000 in legal fees on HIG's behalf that did not benefit Gulf Fleet in any manner. Gulf Fleet had no obligation to pay these bills. Accordingly, HIG was unjustly enriched.

92. The CSA and PSA were mere artifices to take money from the Debtors without providing services. The services, if any, provided under the CSA and PSA did not benefit the Debtors. Indeed, HIG harmed the Debtors by allowing those fees to accrue, not requiring an accounting, and not receiving any benefits. The CSA and PSA were the mechanism by which HIG and the HIG Employees exerted improper influence on the Debtors. Therefore, HIG and the HIG Employees were unjustly enriched by the CSA and PSA payments. The Court should make the Trust whole for the inequities of these payments.

93. Additionally, as stated above, several other self-dealing and inequitable transactions resulted in benefits conferred upon HIG and the HIG Employees, which this Court should rectify as equity requires.

94. The Trust is entitled to a money judgment against the Defendants in an amount to be proven at trial for the inequitable acts described.

## COUNT 9: QUANTUM MERUIT

95. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

96. Gulf Fleet paid over $1 Million in equipment, materials, and labor to Thoma-Sea in connection with construction of the *Gulf Tiger*. At the time the payments were made, GF Tiger Acquisition was the beneficial owner of the construction contract for the *Gulf Tiger*. GF Tiger Acquisition has not reimbursed Gulf Fleet for the equipment, materials, and labor provided to Thoma-Sea. Gulf Fleet is entitled to reimbursement of payments rendered to Thoma-Sea on behalf of GF Tiger Acquisition.

97. As stated in Count 8 above, and otherwise stated herein, the Debtors are entitled to recover for the benefits conferred on HIG and the HIG Employees that were obtained under the pretext of the PSA and CSA. For instance, while the CSA and PSA entitled the HIG Employees to expense reimbursements for work performed for the Debtors, the HIG Employees obtained reimbursement of expenses that were improperly charged to the Debtors.

98. Also, HIG used the Debtors' assets for its own purposes as part of a Single Business Enterprise, taking the benefit of those assets without paying for them. For instance, as stated above, HIG caused the Debtors to pay $500,000 of legal bills that had no benefit to the Debtors.

99. The Trust is entitled to payment from the Defendants for the amount of benefit conferred upon them as equity requires.

## COUNT 10: PARTNERSHIP LIABILITY

100. Upon information and belief, HIG, GF Tiger Acquisition, GF Financing, and the Debtors formed an ordinary partnership or joint venture because each of the entities did, without limitation, one or more of the following:

- HIG and its affiliates expressed an intent to be partners in Gulf Fleet's business when they decided, among other things, to execute the PSA and CSA and hold positions on Gulf Fleet's board of directors;

- HIG and its affiliates regularly contributed money or property to Gulf Fleet's business to meet daily operating expenses; and

- HIG and its affiliates regularly worked to ensure that Gulf Fleet's outstanding debt positions would not affect the equity that each party held in Gulf Fleet;

101. The Trust and the creditors should be able to collect from each member of the partnership for the partnership debts.

**COUNT 11: SINGLE BUSINESS ENTERPRISE**

102. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

103. Louisiana law recognizes corporations as separate entities for various reasons. Nonetheless, courts disregard the legal fiction of a distinct corporate entity when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation.

104. Eighteen factors are used to determine whether separate entities are a "single business entity."[11] Gulf Fleet, as the puppet of HIG and the HIG Subsidiaries, GF Tiger Acquisition, GF Financing, and Brightpoint acted as a single business entity under Louisiana law:

- The companies had identical ownership. They were part of HIG's corporate assets.

- The companies had identical leadership. HIG's directors and officers ultimately controlled the decisions made by its employees and agents with respect to its subsidiaries.

[11] See, *Green v. Champion Ins. Co.*, 577 So.2d 249, 257 (La. App. 1st Cir. 1991).

- HIG and its subsidiaries' business functions were supplementary: the HIG Subsidiaries existed exclusively as subsidiaries of HIG to fund one-off deals and attempt to insulate HIG from liability otherwise.
- The directors and officers of HIG acted in their own personal interests as opposed to Gulf Fleet's interest.
- HIG directly financed its subsidiaries.
- The HIG Subsidiaries were never capitalized.
- HIG would form another subsidiary for each one-off deal immediately before closing the transaction.
- HIG funded the closing costs and professional fees of its special purpose subsidiaries.
- The HIG Subsidiaries were formed exclusively to engage in one or a few transactions already negotiated by the HIG Employees.
- Gulf Fleet and the HIG Subsidiaries shared common offices.
- Gulf Fleet and the HIG Subsidiaries used common accountants and attorneys.
- HIG Employees regularly negotiated deals on behalf of HIG Subsidiaries.
- As a practice, HIG formed a new subsidiary in order to engage in any deal or transaction.

105. Because HIG treated all of the HIG Subsidiaries (including Gulf Fleet) as a single business enterprise, HIG is liable for all the debts of Gulf Fleet.

106. The Court should impose liability upon HIG as part of a single business enterprise because:

- HIG was a majority owner of Gulf Fleet.
- HIG, either directly or indirectly through subsidiaries that are part of a single business entity with HIG, financed Gulf Fleet's operations.
- Gulf Fleet was inadequately capitalized at all times.
- HIG, or employees under its direct supervision and control, regularly approved board of director-level transactions on behalf of HIG and Gulf Fleet.

- HIG Employees served as directors of Gulf Fleet. At certain times, whether properly titled or not, the HIG Employees served as officers of Gulf Fleet.

107. Because HIG and its affiliates treated Gulf Fleet as part of its single business enterprise, HIG is jointly and severally liable and/or has solidary liability for the debts of the enterprise. The Trust is entitled to a money judgment against HIG in the amount of the unsatisfied obligations of Gulf Fleet on the Petition Date.

**COUNT 12: DIRECT ACTION AGAINST STEADFAST**

108. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

109. Defendant Steadfast issued a Private Company Directors, Officers and Employees Liability Policy, which was effective from February 1, 2010 up to and through February 1, 2011 (Policy No. DOC 9380475 01). This insurance policy provides coverage for monetary damages or injuries arising from the claims set forth herein. Steadfast was made aware and put on notice of the claims set forth herein during the coverage period.

110. Defendant Steadfast is directly liable to the Trust for the acts and claims detailed herein that the HIG Employees committed during the time period that the policy was in effect pursuant to La. R.S. § 22:655.

**COUNT 13: ATTORNEY'S FEES**

111. The Trustee incorporates each of the above allegations by reference as if set forth fully herein.

112. The Trustee seeks all of his reasonable and necessary attorney's fees and costs in connection with the causes of action set forth above.

**JURY DEMAND**

113. The Trustee demands a trial by jury.

WHEREFORE, PREMISES CONSIDERED, the Trustee prays that HIG, Brightpoint, Fox, Zanarini, Tamer, GF Financing, and GF Tiger Acquisition be cited to appear and answer, and that this Court:

1) Avoid and recover the avoidable fraudulent transfers;

2) Subordinate and recharacterize the insider claims;

3) Grant damages set forth in all of the related causes of action;

4) Grant punitive damages to the extent permitted by law;

5) Grant reasonable and necessary attorneys' fees and expenses;

6) Award pre-judgment and post-judgment interest and award costs in favor of the Trustee; and grant the Trustee all other relief, in law or in equity, to which he shows himself justly entitled.

DATED: March 21, 2011.

Respectfully submitted,

MCKOOL SMITH P.C.

By: *\/s/ Hugh M. Ray, III*

HUGH M. RAY, III
State Bar No. 24004246
CHRISTOPHER D. JOHNSON
State Bar No. 24012913
BLAKE BAILEY
State Bar No. 24069329
600 Travis, Suite 7000
Houston, Texas 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344

ATTORNEYS FOR ALAN GOODMAN,
LIQUIDATING TRUSTEE